# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:15-cv-00248-MR-DSC

| | | |
|---|---|---|
| **TD BANK, N.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **CARLAND TRACTOR AND EQUIP.,** | ) | |
| **INC., ANTHONY E. CARLAND, MAX** | ) | |
| **LOWE CARLAND JR., and ELLEN C.** | ) | |
| **CARLAND,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's motion for summary judgment as to the counterclaims asserted by Defendant Max Lowe Carland Jr. (herein "Max Carland"), and Defendant Ellen C. Carland (herein "Ellen Carland"). [Doc. 29]. Also before the Court is the Plaintiff's motion for summary judgment as to its claims asserted against Max Carland and Ellen Carland. [Doc. 43].

The Plaintiff initiated this action on November 9, 2015 against Defendant Carland Tractor and Equip., Inc. (herein "Defendant Company"), Defendant Anthony E. Carland (herein "Anthony Carland"), Max Carland, and Ellen Carland. [Doc. 1]. Max Carland and Ellen Carland filed an Answer

and Counterclaims on January 6, 2016. [Doc. 13]. Defendant Company and Anthony Carland failed to answer the Complaint or otherwise plead, and on January 26, 2016, the Clerk made entries of default against them. [Docs. 20, 21]. The Plaintiff now seeks summary judgment in its favor both as to its claims against Max Carland and Ellen Carland and as to the counterclaims those two Defendants filed against it. [Docs. 29, 43].

## BACKGROUND

This is an action brought by the Plaintiff to recover the deficiencies remaining after the liquidation of assets securing two of its loans. While the two loans at issue closed in 2009, the Defendants' relationship with the Plaintiff (and Plaintiff's predecessors in interest) existed for many years prior to that time. An understanding of the parties' prior financial arrangements – that three earlier extensions of credit were ultimately refinanced into the two loans at issue – is necessary to a proper resolution of this matter.

## I.     Incorporation of Defendant Company and Initial Lending.

In 1989, Ellen Carland incorporated "Carland Ford Tractor and Equip., Inc." under the laws of the State of North Carolina. [Doc. 31-36 at 3]. In 1996, that entity changed its name to "Carland Tractor and Equip., Inc." ("Defendant Company"). [Id. at 4]. Defendant Company's initial incorporation documents listed Ellen Carland as secretary-treasurer, her son, Anthony

Carland, as president, and her husband, Max Carland, as vice-president.  [Id. at 2].  As relevant here, Anthony Carland remained president of Defendant Company throughout its existence and his father, Max Carland, held various positions and became treasurer of Defendant Company in 2008. [Id. at 6-7].

## A.    The 3163 Loan.

On June 2, 2000, Defendant Company obtained a $400,000 line of credit from Mountainbank[1] (the "3163 Loan").    [Doc. 31-6].    This indebtedness was evidenced by a promissory note executed by Defendant Company, Anthony Carland, Max Carland, and Ellen Carland as individual borrowers.[2]  The line of credit was secured a deed of trust on the 2.66 acres of land containing the principal place of business of Defendant Company (the "Company Property"). [Doc. 31-7]. On September 2, 2006, Anthony Carland signed a one-year renewal of the 3163 Loan.  [Doc. 31-10].  Ellen Carland and Max Carland each signed personal, unlimited continuing debt guarantees regarding this renewal promissory note.  [Docs. 31-11; 31-12]. On December 2, 2007, Anthony Carland signed a second one-year renewal

---

[1] Plaintiff TD Bank, N.A., is the successor by merger to Carolina First Bank, which was the successor by merger to Mountainbank.  [Doc. 31-1].

[2] Also listed as an individual borrower on this promissory note was Lynn B. Carland, Anthony Carland's spouse at the time.  While several documents relevant to this matter bear her signature, she is not a defendant in this action and the Court will not further reference her.

of the 3163 Loan.  [Doc. 31-13].  Ellen Carland and Max Carland each signed personal, unlimited continuing debt guarantees regarding this second renewal promissory note.  [Docs. 31-14; 31-15].  On February 2, 2009, Anthony Carland as borrower, and Max Carland and Ellen Carland as guarantors, signed a loan modification letter extending the maturity date of the 3163 Loan to May 2, 2009.  [Doc. 31-16].  The outstanding balance owed Plaintiff on the 3163 Loan was not satisfied by the May, 2009 maturity date, and this loan went into default.

**B.    The 6706 Loan.**

On February 18, 2004, Defendant Company executed a promissory note and security agreement having borrowed from Carolina First Bank the amount of $675,590.09 (herein the "6706 Loan"). [Doc. 31-21].  The stated maturity date for this loan was February 18, 2009. [Id.]. Ellen Carland and Max Carland each signed personal, unlimited continuing debt guarantees regarding the 6706 Loan. [Docs. 31-22; 31-23].  Ellen Carland and Max Carland also executed a deed of trust pledging approximately 21.21 acres of vacant land as security for the debt (the "21 Acre Tract").  [Doc. 31-24].  On each of February 18, 2009; May 18, 2009; and August 18, 2009; all debtors/guarantors signed loan modification letters ultimately extending the

maturity date of the 6706 Loan to November 18, 2009. [Docs. 31-25; 31-26; 31-27].

### C.    The 5782 Loan.

On March 2, 2006, Defendant Company executed a revolving draw promissory note and security agreement securing a loan from Carolina First Bank in the amount of $350,000.00 (the "5782 Loan"). [Doc. 31-28]. Ellen Carland and Max Carland each signed personal, unlimited continuing debt guarantees regarding the 5782 Loan. [Docs. 31-29; 31-30]. On March 2, 2007, Defendant Company signed a promissory note extending for one year the 5782 Loan. [Doc. 31-31]. On June 3, 2008, Defendant Company signed a promissory note extending for one additional year the 5782 Loan. [Doc. 31-32]. On each of June 3, 2009, and September 3, 2009, all debtors/guarantors signed loan modification letters ultimately extending the maturity date of the 5782 Loan to December 3, 2009. [Docs. 31-33; 31-34].

## II.    Refinancing of the 3163, 6706, and 5782 Loans.

As noted above, the 3163 Loan was not satisfied by the May 2, 2009, maturity date and thereafter was in default. The maturity date of the 6706 Loan was November 18, 2009, and the maturity date of the 5782 Loan was December 3, 2009. On November 16, 2009, the 3163 Loan was refinanced by the execution of a new promissory note by Anthony Carland (herein "Note

1") and the 6706 and 5782 Loans were consolidated and refinanced by the execution of a new and separate promissory note by Defendant Company (herein "Note 2"). Note 1 was in the face amount of $322,811.28 [Doc. 1-2], the proceeds of which were disbursed to pay off the 3163 Loan. [Doc. 31-17]. Ellen Carland and Max Carland each signed personal, unlimited continuing debt guarantees regarding Note 1.[3] [Docs. 31-4; 31-5]. To secure Note 1, Anthony Carland executed a deed of trust in favor of Plaintiff providing as collateral the 2.66 acre Company Property that had previously secured the 3163 loan.[4] [Docs. 31-3 at 2; 38-7 at 1 to 9].

Also on November 16, 2009, Defendant Company executed Note 2, in the face amount of $958,806.20 [Doc. 1-8], the proceeds of which were disbursed to pay off the 6706 and 5782 Loans. [Doc. 31-35]. Anthony Carland, Ellen Carland, and Max Carland each signed personal, unlimited continuing debt guarantees regarding Note 2. [Doc. 1-9]. Ellen Carland and Max Carland also executed a deed of trust to secure Note 2, providing as

---

[3] To further secure Note 1, Ellen Carland and Max Carland also purportedly executed a deed of trust, providing as collateral the 21 Acre Tract that had previously secured the 6706 loan. [Docs. 31-2 at 1; 31-3 at 2]. Such deed of trust, however, does not appear in the record.

[4] The record is silent as to when and under what circumstances Anthony Carland became the sole owner of the land and building upon which Defendant Company's premises stood. None of the parties, however, dispute that Anthony Carland was seized of this property such that he could execute a deed of trust in favor of the Plaintiff.

collateral the 21 Acre Tract that had previously secured the 6706 loan. [Doc. 38-7 at 36 to 44]. Anthony Carland executed a deed of trust in favor of Plaintiff providing as collateral the 2.66 acre Company Property that had previously secured the 3163 loan and had also been pledged to secure Note 1. [Doc. 38-7 at 10 to 19].

Ultimately, due to nonpayment, both Note 1 and Note 2 went into default.

The Plaintiff accelerated Note 1 following default and demanded payment from Anthony Carland, Ellen Carland, and Max Carland by letters dated February 5, 2013. [Doc. 1-5]. Without waiving any of its rights to pursue a possible deficiency [Doc. 1-6 at 3], Plaintiff agreed with Anthony Carland to a "short sale" of the 2.66 acre Company Property. [Doc. 38-7 at 1 to 9]. From the short sale, the Plaintiff received $719,227.13 as net proceeds. [Doc. 1 at 4]. Plaintiff applied these proceeds to various debts Anthony Carland and Defendant Company owed to the bank, including applying $297,374.25 to the balance of Note 1, leaving a deficiency balance on Note 1 in the amount of $33,650.77, consisting of accrued but unpaid interest, late charges, appraisal fees, environmental inspection fees, and legal expenses. [Docs. 1 at 4; 1-7].

The Plaintiff accelerated Note 2 following default and demanded payment from Anthony Carland, Ellen Carland, and Max Carland by letters dated February 5, 2013. [Doc. 1-5]. On May 11, 2015, the 21 Acre Tract was foreclosed upon and sold at public auction for $371,000. [Doc. 1-10]. Plaintiff was the purchaser of the collateral at foreclosure. [Doc. 44 at 2]. On March 1, 2016, Plaintiff resold this same vacant land for a gross sales price of $375,000. [Id. at 3]. Notwithstanding the public auction sales price of $371,000, the Plaintiff has credited the Defendants with the $375,000 resale price, rather than limiting the credit to the $371,000 foreclosure price.[5] [Id.]. After applying the revised credit of $375,000 to Note 2, the balance of Note 2 as of November 9, 2015, (the date this action was instituted) was $212,295.32, plus interest at the rate of $32.39 per day thereafter. [Doc. 44-3]. Plaintiff seeks judgment against Ellen Carland and Max Carland for this deficiency amount from Note 2 and the $33,650.77 deficiency amount from Note 1.

---

[5] The resale price obtained by the Plaintiff was $4,000 more than Plaintiff's winning bid for the property the previous year, and $100,000 more than the property's February 11, 2016, appraisal value of $275,000. [Doc. 44-1 at 50].

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists. Id. Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-movant as well. Adams. v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## DISCUSSION

### I.  The Defendants' Counterclaims.

The Court begins by addressing Plaintiff's first motion, which seeks summary judgment as to the counterclaims asserted by Max and Ellen Carland.  [Doc. 29].  In their joint Answer, the Carlands allege four counterclaims against the Plaintiff: (1) Fraud/ Misrepresentation; (2) Fraud in the Inducement;  (3)  Negligence/Negligent  Misrepresentation/Non-Disclosure; and (4) Unfair and Deceptive Trade Practices. [Doc. 13 at 18 to 21]. In support of their counterclaims, the Carlands provide the following forecast of facts.

Max and Ellen Carland participated in the incorporation of Defendant Company.  Max Carland was listed on the books as an "owner." [Docs. 38-1 at 2; 38-3 at 2]. Despite this, Max and Ellen testified that they had nothing to do with operating Defendant Company.  [Id.].  Instead, they aver that they ran a family farm as their main source of income and their son, Anthony Carland, handled all of the day-to-day activities of Defendant Company. [Id.]. Further, Anthony Carland was in charge of all of Defendant Company's finances and records, and according to Max and Ellen, Anthony never shared with them any information related to the financial condition of Defendant Company.  [Id.].  Max and Ellen testified that in 2009, Anthony approached

them and asked whether they would be willing to execute a deed of trust on the 21 Acre Tract in favor of Plaintiff as collateral for a loan to be given to Defendant Company. [Docs. 38-1 at 3; 38-3 at 3]. Max and Ellen Carland agreed to do so. [Id.].

Anthony Carland testified consistently with the background that Max and Ellen Carland described, and further explained the discussion he had with his parents regarding the deed of trust he asked them to execute.

> In 2009, I owned and operated Carland Tractor and Equipment, Inc. My father Max Carland was listed as an "owner" but he did not participate in the financial matters of Carland Tractor and Equipment, Inc. I did not share with either Max or Ellen Carland the financials of Carland Tractor and Equipment, Inc. as it was my company. Ellen Carland was not nor ever has been an owner in Carland Tractor and Equipment, Inc. … For many years any loan payments were made on a timely basis to any creditor for Carland Tractor and Equipment, Inc.; however, sometime in either 2008 or 2009 my son-in-law apparently took funds from the company necessitating a replacement loan. He has since died. I informed the bankers at Carolina First of the fact he apparently took funds from the company and that I needed a loan to put back what he took. They agreed to renew loans and requested that I ask my parents to provide 21 acres as additional collateral. At no time did they inform me that they would be asking my father and mother to personally guarantee all loans with Carolina First Bank.

[Doc. 38-5 at 2].

On November 16, 2009, Max and Ellen Carland appeared at an attorney's office for the closing on Note 1 and Note 2. According to Max Carland:

To the best of my knowledge I was presented several documents to sign on November 16, 2009 all of which I distinctly thought were designed to provide collateral for TD Bank with respect to a loan to Carland Tractor and Equipment, Inc. … At no time did anyone from TD Bank inform me that I was signing "cross collateralized" personal guarantees for any and all of the debt of Carland Tractor and Equipment, Inc. To the contrary, and to the best of my knowledge I, along with my wife, Ellen met with a representative from TD Bank who merely placed papers in front of us to sign; again, I was under the impression I was providing my signature in order to allow TD Bank to put a deed of trust on property.

[Doc. 38-1 at 3]. Ellen testified in the same manner. [Doc. 38-3 at 3].

This forecast provides the common thread of facts running through each of the four counterclaims asserted by Max and Ellen Carland. Based upon this forecast, the Carlands argue that they were intentionally or negligently deceived or misled, and thereby induced to enter into their guarantees of Notes 1 and 2 while ignorant of fact that Anthony Carland and Defendant Company were in a precarious financial condition. Further, Max and Ellen Carland argue the Plaintiff had knowledge that Anthony Carland and Defendant Company were on the brink of insolvency and thus had a duty to inform them about these facts before accepting their financial undertakings. [Doc. 39 at 3].

Max and Ellen Carland rely principally on the North Carolina Court of Appeals' decision in Whisnant v. Carolina Farm Credit, 204 N.C. App. 84, 693 S.E.2d 149 (2010). In Whisnant, the North Carolina Court of Appeals

reversed the trial court's grant of summary judgment in favor of the movant-bank. The forecast of evidence in the light most favorable to the non-moving Whisnants was as follows. Plaintiffs David and Lois Whisnant, husband and wife, owned real property in Lawndale, North Carolina. Whisnant, 204 N.C. App. at 85, 693 S.E.2d at 151. Defendant Carolina Farm Credit ("CFC") issued a loan to James and Elaine Wilson, the owners and operators of the South Mountain Greenhouse (the "Nursery"). The Wilsons were the sister and brother-in-law of the plaintiff, David Whisnant. Prior to the events giving rise to the lawsuit, the Whisnants had previously established a personal borrowing history with CFC. Id. Between 2001 and 2005, the Whisnants and the Wilsons signed a series of promissory notes to obtain financing for the Wilson's Nursery. Id. Some of the later notes in the series were executed for purposes of consolidating, modifying and refinancing earlier notes made by them. Id. These loans were made for the operation of the Nursery by the Wilsons. Id. The Whisnants signed the notes in order for their extended family, the Wilsons, to receive financing for the Nursery. The Whisnants had no ownership interest in the Nursery and received no financial benefit from it; the Whisnants were also not recipients of the loan proceeds. Whisnant, 204 N.C. App. at 90, 693 S.E.2d at 154. CFC was unable to collect any payments on the indebtedness from the Wilsons due to their filing of a

Chapter 13 Bankruptcy Petition in 2005. Id. CFC thus proceeded with its efforts to foreclose on the Whisnants' real property, the collateral pledged as security for the Wilsons' debt to CFC. Id. In response, the Whisnants brought an action seeking to enjoin the foreclosure of their property, as well as seeking damages from CFC on claims of fraud in the inducement, actual fraud, negligence, and unfair and deceptive trade practices. The trial court granted CFC's motion for summary judgment and dismissed the Whisnants' lawsuit. The Whisnants then appealed.

In reversing the trial court's grant of summary judgment in favor of CFC, the court of appeals observed:

> [i]f the creditor knows or has good grounds for believing that the surety is being deceived or misled, or that he was induced to enter into the contract in ignorance of facts materially increasing the risk, of which he has knowledge, and he has an opportunity before accepting his undertaking, to inform him of such facts, good and fair dealing demand that he should make such disclosure to him; and if he accepts the contract without doing so, the surety may afterwards avoid it. **It was at one time asserted that all the information in obligee's power must be given to enable the promisor to estimate the character of the risk he is invited to undertake. This view, however, finds no support today.** A surety is in general a friend of the principal debtor, acting at his request, and not at that of the creditor; and, **in ordinary cases, it may be assumed that the surety obtains from the principal all of the information which he requires.** This is the rule applicable unless there is some fact, which the creditor knows the surety probably will not discover, of such vital importance to the risk that the creditor must have been aware that the non-disclosure would in effect amount to a contrary representation to the surety. The concealment must in fact or in

law be fraudulent. **There is nothing in the mere nature of the contract of suretyship itself which requires the obligee to disclose to the proposed surety all the material facts affecting the risk. There must be a duty on the part of the obligee to make the disclosure.**

Whisnant, 204 N.C. App. at 88-89, 693 S.E.2d at 153 (quoting Constr. Co. v. Crain and Denbo, Inc., 256 N.C. 110, 120-21, 123 S.E.2d 590, 598 (1962)) (emphasis added).

By way of an affidavit, the verified complaint, and the testimony of David Whisnant, the Whisnants proffered evidence tending to show that the only purpose for their involvement was to pledge their real property as additional collateral for the Wilson loan. They received no benefit. Whisnant, 204 N.C. App. at 92, 693 S.E.2d at 155. More importantly, however, when the Whisnants were signing the notes, they began to "question the financial health of the South Mountain Greenhouse" and were informed by a CFC loan officer that "everything looks to be running okay[,]" so they continued signing loan documents. 204 N.C. App. at 93, 693 S.E.2d at 156. Based on this showing, the court of appeals concluded that the record raised a genuine issue of material fact as to whether the Whisnants were "induced to enter into the contract in ignorance of facts materially increasing the risk, of which [defendant] ha[d] knowledge, and [defendant] ha[d] an opportunity before

accepting [plaintiffs'] undertaking, to inform [plaintiffs] of such facts[.]" <u>Id.</u>, quoting <u>Crain and Denbo</u>, 256 N.C. at 120, 123 S.E.2d at 598.

In the present matter, Ellen and Max Carland provide a forecast of evidence from themselves and from Anthony Carland that Anthony failed to inform them about his business and the "the financials of Carland Tractor and Equipment, Inc." [Doc. 38-5 at 2]. In short, Ellen and Max Carland argue that the facts taken in the light most favorable to them show that *Anthony Carland* misled or deceived them with regard to the financial health of Defendant Company as well as his own. This showing, however, is insufficient. To preclude summary judgment, the Carlands must point to facts further showing that Plaintiff (lender):

> knew or had good grounds for believing that [the guarantors were] being deceived or misled, or that [they were] induced to enter into the contract in ignorance of facts materially increasing the risks, of which [the lender] ha[d] knowledge, and [the lender] ha[d] an opportunity, before accepting [the guarantors'] undertaking, to inform [them] of such facts.

<u>Whisnant</u>, 204 N.C. App. at 88-89, 693 S.E.2d at 153, citing <u>Gant v. NCNB</u>, 94 N.C. App. 199-200, 379 S.E.2d 865, 867, <u>review dismissed</u>, 325 N.C. 706, 388 S.E.2d 453 (1989).

Ellen and Max Carland have made no such showing. They point only to facts raising an inference that Plaintiff possessed knowledge the Defendant Company was financially distressed. <u>See</u> Affidavit of Max

Carland ("I met with an individual whom I believe to be named, Tom Doyle, who I have since learned was a 'special assets' officer for TD Bank. I have since learned that a 'special assets' officer is in charge of collections on delinquent accounts."). [Doc. 38-1 at 3]. <u>See also</u> Affidavit of Anthony Carland ("For many years any loan payments were made on a timely basis to any creditor for Carland Tractor and Equipment, Inc.; however, sometime in either 2008 or 2009 my son-in-law apparently took funds from the company necessitating a replacement loan."). [Doc. 38-5 at 2]. It is undisputed that the Plaintiff knew the financial condition of Defendant Company and Anthony Carland. The Plaintiff had to know this information in order to make its lending decision, but that begs the question. The critical inquiry is whether the Plaintiff knew or had good grounds for believing that the Carlands were being deceived or misled by their son about his financial status or that of Defendant Company. Max and Ellen Carland have presented no forecast of evidence tending to show this. On the contrary, the evidence shows that the Defendants had informed the Plaintiff that Max Carland was a 50% owner of Defendant Company, was an officer of Defendant Company throughout its existence, and was Defendant Company's Treasurer in November, 2009, when Note 1 and Note 2 were executed. [Docs. 38-7 at 24; 31-36 at 1to 10]. Further, the evidence shows

that the Defendants had provided information to the Plaintiff showing that
Defendant Company was "a family owned and operated business" and that
"Max and Ellen Carland and their son Anthony run the day to day operations
of the tractor sales and service center as well as raising cattle and various
other forms of farming."  [Docs. 38-7 at 24].   Moreover, in the guarantee
agreements executed by both Max and Ellen Carland, they warranted to the
Plaintiff that such agreements were "entered into at the request of"
Defendant Company and Anthony Carland, and that they were "satisfied
regarding the … financial condition and existing indebtedness" of Defendant
Company and Anthony Carland.  [Docs. 1-3 at 3 & 7; 1-9 at 7 & 11].

> [I]n ordinary cases, it may be assumed that the surety obtains
> from the principal all of the information which he requires. This is
> the applicable rule unless there is some fact, which the creditor
> knows the surety probably will not discover, of such vital
> importance to the risk that the creditor must have been aware
> that the non-disclosure would in effect amount to a contrary
> representation to the surety.

First Citizens Bank & Trust Co. v. McLamb, 112 N.C. App. 645, 650, 439
S.E.2d 166, 169 (1993). In taking the forecasts of evidence in the light most
favorable to the Carlands, the inferences drawn from such evidence show
that the Plaintiff reasonably believed Max and Ellen Carland were involved
in the daily operation of Defendant Company and understood its financial
condition and that of Anthony Carland at all relevant times.   Plaintiff,

therefore, had no reason to believe Anthony Carland was misleading or deceiving them about the same and thus Plaintiff had no obligation to speak up and provide them with such information.

Max and Ellen Carland's factual forecast also lacks any evidence that they were induced to sign any of the security documents for Note 1 and Note 2 in ignorance of facts materially increasing their risk of which the Plaintiff had knowledge. In other words, nothing in the record indicates that the Carlands' risk was materially increased by any wrongful withholding on the part of Plaintiff.  Prior to the November 16, 2009, closing on Note 1 and Note 2, Max and Ellen Carland were already obligated for the debts of both Anthony Carland and Defendant Company.  Note 1 and Note 2 paid off the prior debt for which Max and Ellen Carland were either original borrowers or sureties and for which they had previously pledged their 21 acre tract as security.  At the time of the closing on Note 1 and Note 2, Max and Ellen Carland were already in default on the 3161 Loan, which was refinanced with the execution of Note 1.  Further they were only two days away from defaulting on the 6706 Loan which comprised the vast majority of the debt consolidated and refinanced into Note 2. When the 3163, 6706, and 5782 Loans were paid off by the proceeds disbursed from Note 1 and Note 2, the risk assumed by Max and Ellen Carland actually improved by such financing

because it had the effect of curing their current default on the 3163 Loan and deferring their imminent default on the 6706 and 5782 Loans.[6]

Max and Ellen Carland respond by asserting they believed the documents they signed on November 16, 2009, were "designed to provide collateral for TD Bank with respect to a loan to Carland Tractor and Equipment, Inc." [Docs. 38-1 at 3; 38-3 at 3]. Each of them testified that "I was under the impression I was providing my signature in order to allow TD Bank to put a deed of trust on property." [Id.]. Further, Max and Ellen Carland argue they were ignorant of the $78,112.50 loan procured by Anthony Carland which was secured by their deed of trust [Doc. 38-7 at 37] and thus increased their risk. The Carlands' belief about, or impression regarding the contents of, the documents they signed November 16, 2009, is immaterial. Under North Carolina law, the parties to a contract have an affirmative duty to read and understand what is written in the document before they sign it. Town of Belhaven v. Pantego Creek, LLC, 793 S.E.2d 711, 719 (N.C. Ct. App. 2016).

---

[6] As such, it is irrelevant as to whether Max and Ellen Carland were accommodation parties because they directly benefitted by the satisfaction of their prior outstanding obligations.

Max Carland, nevertheless, testified that he was "legally blind and without the benefit of proper sight."[7] [Doc. 38-1 at 2]. He contends, therefore, that he cannot be held accountable for the actual contents of a contract that differed from his impression of what terms the contract should have contained. Mr. Carland's argument, however, suffers from two fatal flaws. First, he does not indicate at what point in time he lost his sight, or more precisely, that he was unable to read on the day the closing was held for Note 1 and Note 2. Second, even if Mr. Carland was legally blind on November 16, 2009, his contention that he should be excused from the promises contained in the contracts he signed that day is without merit. As explained by the North Carolina Supreme Court:

> It is defendant's duty to read the contract, **or have it read to him**, and his failure to do so, in the absence of fraud, is negligence for which the law affords no redress. The defendant's duty to read or to have read to him the contract is a positive duty of which he is not relieved except in cases of fraud.

Breece v. Standard Oil Co., 209 N.C. 527, 530, 184 S.E. 86, 88 (1936) (emphasis added). As explained above, no fraud or deception was committed by the Plaintiff in this matter. Equally important, the Carlands

---

[7] The Court is perplexed by Max Carland's testimony regarding his vision which implies that he is unable to see well enough to read. Such testimony conflicts with sworn testimony, he provided just three weeks later, that declared, "I have read the counter claim filed herein and by way of this affidavit verified that the facts as presented to the best of my knowledge are true and correct except for those matters stated upon information and belief." [Doc. 38-2 at 2 (emphasis added)].

point to no evidence in the record indicating that, on November 16, 2009, Ellen Carland was unable to read for herself, or read to her husband, the documents they signed that day. In the absence of any such showing, Max and Ellen Carland are bound by what they signed and charged with the knowledge of what was contained in their contracts.

Based upon the foregoing, and taking the facts in the light most favorable to Max and Ellen Carland, the Court concludes that there is no genuine issue as to any material fact regarding the counterclaims asserted by Max and Ellen Carland, and thus summary judgment in favor of Plaintiff should be granted as to such counterclaims.

## II.    The Plaintiff's Claims.

The Plaintiff's second motion seeks summary judgment on its claims asserted against Max and Ellen Carland.  [Doc. 43].  The forecast of evidence provided by the Plaintiff, and not contested by Max and Ellen Carland, shows that deficiency amounts remain following the liquidation of assets pledged to secure Note 1 and Note 2.  Max and Ellen Carland raise three arguments, however, in an effort to demonstrate the existence of disputed material facts that would prevent summary judgment on Plaintiff's claims.[8] [Doc. 39 at 3].  These arguments assert that factual questions exist

─────────────────

[8] The other facts purportedly in dispute, listed as bullet points on pages three and four of

concerning whether: (1) Plaintiff is the true owner and holder of Note 1 and Note 2; (2) Plaintiff released Max and Ellen Carland when it agreed with Anthony Carland to accept a short sale of the Company Property; and (3) Plaintiff obtained the fair value of the Carlands' 21 Acre Tract through foreclosure.

## A. Ownership of Note 1 and Note 2.

Max and Ellen Carland argue that the record evidence is debatable as to whether Plaintiff is the rightful holder of Note 1 and Note 2. "And, contrary to Ms. Taggart's [sic] affidavit, the Defendants dispute any suggestion that somehow Mountainbank loans made their way to Carolina First Bank, then to TD Bank." [Doc. 39 at 13]. Plaintiff has presented the affidavit of Shelley McTaggart, a Vice President of Plaintiff, wherein she testifies that Plaintiff is the successor by merger with Carolina First Bank and that Carolina First Bank was previously the successor by merger with Mountainbank. [Doc. 31-1 at 1]. In addition, Exhibit C to Plaintiff's Complaint contains the Articles of Merger demonstrating this fact. Further, the verified Complaint, which the Court accepts as an affidavit for the purposes of summary judgment, states that Plaintiff was the surviving corporation following its merger with Carolina

the Carlands' Memorandum in Opposition [Doc. 39], have been addressed by the Court <u>supra</u> in Part I of this Opinion.

First Bank. [Doc. 1 at 3, ¶¶ 18-19]. In the face of this evidence, "the burden then shifts to the non-moving party who must convince the court that a triable issue exists." Bouchat, 346 F.3d at 522. Notwithstanding the fact that they "dispute" this evidence, Max and Ellen Carland provide no contrary forecast of evidence. The Carlands offer only a conclusory argument that the Plaintiff's proof is somehow insufficient but have failed to show that a triable issue exists. The Carlands' argument on this issue is therefore without merit.

### B. Short Sale of Defendant Company's Property.

At the request of Anthony Carland, the Plaintiff agreed to a sale of some of the collateral securing Note 1, namely the Company Property, for an amount less than what was owed to Plaintiff. Following this short sale, the Plaintiff executed a Release Deed [Doc. 38-7 at 20], releasing the 2.66 acre Company Property as security for that debt. Max and Ellen Carland argue that Plaintiff thereby discharged them of their obligations as guarantors. [Doc. 39 at 3]. In support of their argument, the Carlands cite to a provision of the release deed that states, "[i]t is the intent of [TD Bank] to release from the above deeds of trust and any modification thereto and any other security instrument held by [TD Bank] secured by the above described property in order that the same may be conveyed free and clear of any liens in favor of [TD Bank]." [Doc. 38-7 at 20]. The Carlands argue that the

Plaintiff's release of the 2.66 acre Company Property in this way discharged them as well, particularly since Note 1 and Note 2 were cross-collateralized. [Doc. 39 at 20].

The Carlands' argument so framed is not a factual dispute at all but a question of law for the Court to resolve by reference to the documents in question. Martin v. Martin, 26 N.C. App. 506, 508, 216 S.E.2d 456, 457-58 (1975) (holding where the language of a contract is plain and unambiguous, construction of the agreement is a matter of law). The Court begins with the general proposition under North Carolina law that a material alteration of a contract between a principal debtor and creditor without a guarantor's consent will discharge the guarantor from its obligation. First Citizens Bank & Trust Co. v. McLamb, 112 N.C. App. 645, 649, 439 S.E.2d 166, 168 (1993). This general rule, however, can give way to the parties' intent if the same is clearly expressed in the terms of their contract. See, e.g., Branch Bank & Trust Co. v. Creasy, 301 N.C. 44, 57-58, 269 S.E.2d 117, 125 (1980) (explaining the effect of language in a guaranty agreement whereby the signatory agrees she is bound to pay the debt of another despite any renewals, extensions and modifications thereof, waives the benefit of discharge which would otherwise be provided by an extension of time). In this matter, the guaranty agreements executed separately by Max and Ellen

Carland to secure Note 1 and Note 2 contained waivers fatal to their argument. These agreements provide, in pertinent part,

> I consent to certain actions you take, and generally waive defenses that may be available based on these actions or based on the status of a party to the Debt or this Guaranty. … You may release any Borrower, endorser, guarantor, surety, accommodation maker or any other co-signer. … **You may release, substitute or impair any Property**.

[Doc. 1-3 at 2; 6 (emphasis added)]. By executing the guaranty agreements, Ellen and Max Carland made explicit their intent to give up any right of discharge due to any future consent by Plaintiff to a sale of collateral and the execution of any documents enabling the same.[9] Thus, there is no genuine issue of fact presented by Max and Ellen Carland regarding this issue and the legal argument they raise is without merit.

### C.  Fair Market Value of the 21 Acre Tract Foreclosed Upon.

Lastly, Ellen and Max Carland contend that a factual dispute exists with regard to the value of their 21 Acre Tract Plaintiff purchased at foreclosure. [Doc. 39 at 3].

After default on Note 2, the Plaintiff purchased the Carlands' 21 Acre Tract following foreclosure at public auction for $371,000.00. [Doc. 44 at 2].

---

[9] In a similar vein, the language quoted <u>supra</u> from the Release Deed manifests the Plaintiff's intent to release only the Company Property as collateral. Notwithstanding the arcane grammar used in the Release Deed, the phrase, "in order that the same may be conveyed free and clear of any liens," clearly indicates that Plaintiff intended to release only the 2.66 acre Company Property and nothing more.

The Plaintiff thereafter listed the property for resale with a broker for the initial list price of $539,900. [Id.]. After receiving no offers, the Plaintiff reduced the list price to $489,900 in November 2015, and reduced the price again to $469,900 in December 2015. [Id.]. In February 2016, during the listing period, the property appraised at only $275,000. [Doc. 44-1 at 50]. Given the appraisal and lack of any offers at a higher price, the Plaintiff ultimately sold the property in March, 2016 for $375,000. [Doc. 44 at 3]. The Plaintiff concedes that the $375,000.00 resale amount as the proper value of the 21 Acre Tract rather than its bid amount. [Id.]. Such amount, less foreclosure expenses ($4,723.04), results in a revised credit of $370,276.96 against the Note 2 indebtedness. [Id.].

North Carolina makes available to certain loan obligors a statutory defense or offset in actions brought by a lender to recover the deficiency following the foreclosure sale of the collateral. According to the North Carolina Court of Appeals:

> Typically, following a foreclosure sale, the amount of the debt is deemed reduced by the amount of the net proceeds realized from said sale. See N.C. Gen. Stat. § 45–21.31(a)(4) (2013). However, this general rule is abrogated by G.S. 45–21.36 in situations where the foreclosing creditor — which in this case is the Bank — ends up purchasing the property at the foreclosure sale. Specifically, G.S. 45–21.36 provides that where the foreclosing creditor purchases the property and subsequently sues to collect the deficiency, certain obligors may "as [a] matter of defense" show that the collateral "was fairly worth the amount

of the [entire] debt[,]" a showing which would "defeat ... any deficiency judgment against [any said obligor]." N.C. Gen. Stat. § 45–21.36. Alternatively, G.S. 45–21.36 provides that the obligor may by way of "offset" show that the creditor's winning foreclosure bid was "substantially less than [the collateral's] true value[,]" a showing which would "offset any deficiency judgment against [any said defendant]." Id.

Branch Bank & Trust Co. v. Smith, 769 S.E.2d 638 (N.C. App), disc. rev. denied, 368 N.C. 353, 777 S.E.2d 66 (2015). Further, non-mortgagor guarantors of a loan may raise the anti-deficiency defense set forth in section 45–21.36 of the North Carolina General Statutes in order to reduce their outstanding indebtedness to the primary borrower's lender. High Point Bank & Trust Co. v. Highmark Properties, LLC, 368 N.C. 301, 776 S.E.2d 838 (2015). The burden, however, rests with Max and Ellen Carland, the non-movants, to forecast evidence to create an issue of fact that either: (1) the 21 Acre Tract was worth more than the amount of the approximately $565,000.00 debt [Doc. 44-3], or (2) the amount the Plaintiff credited against the debt as the value of the property based upon subsequent sale ($375,000.00), was substantially less than the property's true value. The Carlands, however, provide no forecast of evidence contesting the amount of the debt or the credit given for the value of the property. They merely ask rhetorically "[w]hether the bank reasonably extracted the fair value of the

property by way of the foreclosure?"[10] [Doc. 39 at 3]. The Carlands'
unsupported rhetorical question is insufficient to raise a genuine issue of
material fact. The Carlands' argument on this issue is therefore without merit.

### D. Amount Owed by Defendants.

The Plaintiff has provided the following factual forecast with regard to
the deficiency balances remaining after the liquidation of assets securing
Note 1 and Note 2.

Regarding Note 1, Plaintiff agreed with Anthony Carland to a short sale
of the building and property occupied by Defendant Company, which was
the collateral described in the deed of trust executed by Anthony Carland.
[Doc. 38-7 at 1 to 9]. From the proceeds of the short sale, Plaintiff applied
$297,374.25 to the balance of Note 1, leaving a deficiency balance on Note
1 in the amount of $33,650.77, consisting of accrued but unpaid interest
($15,552.12), late charges ($2,571.33), appraisal fees ($3,404.24),
environmental inspection fees ($8,388.00), and legal expenses ($3,735.08).
[Doc. 1-7].

Regarding Note 2, after allowing the revised credit of $370,276.96, the
total deficiency as of November 15, 2016, was $212,295.32 plus interest at

---

[10] It should be noted that the only appraisal of the property in the record is substantially
below the credit given by the Plaintiff. [Doc. 44-1 at 50].

the rate of $32.30 per diem.  [Doc. 44-3].  The Plaintiff claims entitlement to attorneys' fees as of the date it initiated this action on November 9, 2015. [Doc. 44 at 4].  Fifteen percent of $200,246.24 (the debt flowing from Note 2 on the date the Plaintiff filed its Complaint)[11] equals $30,036.94. [Id.].

The Defendants have presented no forecast of evidence to show that there is any genuine dispute as to any of these amounts.

## III.  CONCLUSION.

For all of the foregoing reasons, the Plaintiff's motion for summary judgment as to the counterclaims asserted by Max and Ellen Carland [Doc. 29], as well as its motion for summary judgment as to its claims asserted against Max and Ellen Carland [Doc. 43], will be granted.  The Court therefore concludes as a matter of law that:  (1) as to Note 1, Max Carland and Ellen Carland, jointly and severally, owe Plaintiff $33,650.77[12]; and (2) as to Note 2, Max Carland and Ellen Carland, jointly and severally, owe Plaintiff $212,295.32 plus interest at the rate of $32.30 per diem from and after November 16, 2016, until the date hereof (which totals $215,977.52), and attorneys' fees in the amount of $30,036.94.

---

[11] The debt figure of $200,246.24 resulted from combining $194,351.26 of principal and $5,894.98 for 182 days of interest.  [Doc. 44 at 4].

[12] The Plaintiff's prayer for relief seeks no interest or attorneys' fees regarding Note 1, hence none are awarded herein. [Doc. 1 at 9].

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for summary judgment as to the counterclaims asserted by Defendants Max Lowe Carland Jr., and Ellen C. Carland [Doc. 29] is hereby **GRANTED** and said Defendants' counterclaims are hereby **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** the Plaintiff's motion for summary judgment as to its claims asserted against Defendants Max Lowe Carland Jr., and Ellen C. Carland [Doc. 43] is hereby **GRANTED**.

Judgment is being entered contemporaneously herewith against the Defendants Max Carland and Ellen Carland jointly and severally and in favor of the Plaintiff in the amount of $249,628.29 ($215,977.52 + $33,650.77) plus attorneys' fees of $30,036.94.

**IT IS SO ORDERED.**

Signed: March 10, 2017

Martin Reidinger
United States District Judge